# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

GERLING AMERICA INSURANCE )
COMPANY et al., )
                       )
      **Plaintiffs,** )
                       )
      **vs.** )      **Case No. 2:07CV00018MLM**
                       )
**CONTINENTAL CEMENT CO,** )
**LLC/MISSOURI FUEL RECYCLER** )
**a/k/a MFR ENVIRONMENTAL SERVICES,** )
                       )
      **Defendant.** )

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by Defendant Continental Cement Co., LLC/Missouri Fuel Recycler a/k/a MFR Environmental Services ("Defendant" or "Continental" or "MFR"). Doc. 87.   Plaintiffs Gerling America Insurance Company et al. have filed a Response. Doc. 95. Defendant has filed a Reply. Doc. 96.[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). Doc. 8.

## I.
## FACTS[2]

This matter arises out of a railcar explosion which occurred at the facility of BASF Corporation ("BASF") in Freeport, Texas, on or about September 13, 2002.  All named Plaintiffs are

---

[1]        Defendant filed a Statement of Material Facts. Doc. 89.  Plaintiffs responded to Defendant's Statement of Material Facts and filed a Statement of Uncontroverted Material Facts That Create Issues For Trial. Doc. 95.  Defendant responded to Plaintiffs' Statement of Uncontroverted Material Facts That Create Issues For Trial. Doc. 97.

[2]        The facts are undisputed unless otherwise stated.

incorporated in various states and have their principal places of business in various states. Defendant is a Missouri resident with its principal place of business in Missouri. BASF is Plaintiffs' insured. Plaintiffs seek recovery of $9.7 million they collectively paid to BASF in excess of BASF's self-insured retention for damages allegedly resulting from the September 13, 2002 explosion.

An intermediate of BASF's production of nylon at its Freeport facility is Cycloheranone Oxine ("CHO"). CHO is a solid material at temperatures below 194E F. As a solid, CHO is not classified as a hazardous material. As a liquid, CHO is flammable.

In June 2001 BASF transferred CHO waste material (the "material") from its caprolactam facility to highway tank trucks. On June 11, 2001, the material was to be transferred to a railroad tank car, but it had solidified within the highway tank trucks. BASF applied steam heat from a facility boiler to the highway tank trucks to liquefy the material for transfer. Defendant alleges, and Plaintiffs deny, that BASF was aware of the hazards of heating CHO long before the accident of September 13, 2002. Def. Facts, ¶ 13. Further, Defendant contends that "BASF Group possessed a Material Safety Data Sheet for CHO that referenced the 'thermal decomposition' temperature for the chemical as 100EC and instructed, 'To avoid thermal decomposition, do not overheat.'" Def. Facts, ¶ 17. Plaintiffs respond that the Material Safety Data Sheet referred to BASF Aktiengesellschaft.

On June 12, 2001, BASF transferred the contents of the four highway cargo tanks to railroad tank car DBX 9804. Chemical Waste Management was consulted by BASF to broker the disposal of the CHO material. Chemical Waste Management subsequently chose Continental, in Hannibal, Missouri, to dispose of the hazardous waste. Continental's proposal for disposal of the material was contained in a letter dated March 5, 2002, which states, in relevant part, as follows:

I am pleased to provide you with the following quotation involving the BASF

(Freeport, TX), Cyclohexanone Oxime wastestream:

> Approval number: QF02056003
> Quantity-Approximately 20,000 gallons (one time)
> Bulk liquid wastestream to be delivered via rail (steam
> jacketed car)
> Heated material (120-140 degrees F)
> MFR/CCC will apply steam as needed for unloading.

MFR Environmental Services proposes to accept, for waste fuel blending and subsequent utilization, the aforementioned material at a base rate of $.13/gallon plus applicable surcharges.

[SURCHARGE SCHEDULE] ...

In the event solids (a heel) remain in the railcar following the offloading procedure, MFR will contact you for guidance relating to cleanout options. Depending on your needs at the time, we can direct a car to a permitted facility for cleanout prior to return. Again, in such a case, we will consult directly with you before routing the car in any direction.

Def. Ex. 7.

The quotation was addressed to Justin Gilbert, "In-Plant Services/BASF," "Waste Management." In-Plant Services is a non-exclusive provider of waste removal services for BASF at its Freeport facility. Lynn Shreve signed the letter as "Sales and Marketing Manager" for "MFR Environmental Services/Continental Cement Company." The letterhead of the quotation had the names of both Continental and MFR Environmental Services ("MFR"). Pursuant to the quotation, Chemical Waste Management was to be billed for the services provided in the quotation. Ultimately, on January 13, 2003, Chemical Waste Management paid for said services.

In April and May 2002, BASF transferred a second batch of CHO from its facility to the railroad tank car via tank trucks. On June 21, 2002, BASF released railroad tank car DBCX 9804 for transportation to Continental in Hannibal. When BASF sent railroad tank car DBCX 9804 to

Continental for unloading, it provided a Missouri Hazardous Waste Manifest (the "Manifest") for the shipment. The Manifest describes the material as "Flammable liquids, n.o.s., Contains Cyclohexanone Oxime)." The space on the Manifest for indicating "Total Quanity" was left blank. Def. Ex. 10. As such, the Manifest did not state the total quantity of material sent in railroad tank car DBCX 9804. A report prepared by the National Transportation Safety Board ("NTSB") states that, according to BASF, when the railroad tank car departed Freeport, it contained about 22,522 gallons of the waste material. Def. Ex. 1 at 3.

On July 7, 2002, tank car DBCX 9804 arrived at the Continental facility in Hannibal. When the material arrived at Continental, it was solid and required heating in order to liquefy and unload it from the railroad tank car. Continental had never before heated or unloaded CHO such as contained in railroad tank car DBCX 9804. Neither BASF or Chemical Waste Management ever provided Continental any information which would indicate that the material was reactive with heat. On the morning of July 9, 2002, Continental began to steam-heat the coils on the bottom of the railroad tank car. At 5:00 p.m. on July 11, 2002, the material in railroad tank car DBCX 9804 was 215EF. At that point the material was liquefied and could be unloaded. Continental employees used a vacuum truck to prime a pump to start the flow of product from the railroad tank car to a highway tank truck. The highway tank truck was filled, taken to another location, and unloaded at a storage tank. According to the NTSB Report, the first highway cargo tank contained about 7,167 gallons of waste material. Def. Ex. 1 at 4. The highway tank truck returned to the transfer station and the transfer of material resumed. While material was being unloaded from the railcar to the highway tank truck for the second time, the pump began to "suck air," which indicated to Continental employees that all the material that could be pumped from the tank car had been removed. An employee of

4

Continental contends that Continental employees looked into the railroad tank car and were unable to examine the remaining contents because of an object blocking the view into the railcar. Plaintiffs contend that the NTSB Report disputes this contention. The NTSB Report states that, according to the secondary liquid fuel supervisor, shortly after 4:00 p.m., he closed all valves and access ways on tank car DBCX 9894 and applied new security seals to the tank car's two dome housings. Def. Ex. 1 at 5. The NTSB Report further states that MFR practice was to attach security seals to all outgoing tank cars, even those MFR believed were empty. Def. Ex. 1 at 5 n.11. The material remaining in Continental's tank truck and vacuum truck was weighed and transferred to a Continental storage tank. According to the NTSB report, the second load in the cargo tank contained about 4,528 gallons of waste and the vacuum truck contained about 771 gallons of waste. Resp. Ex. 1 at 5. The NTSB Report states that, according to the load receipt, MFR unloaded 12,466 gallons of material from railroad tank car DBCX 9804. Def. Ex. 1 at 5.

On or about July 12, 2002, Continental returned the railroad tank car to the Burlington Northern Railroad in order to send the railcar back to BASF in Texas. Plaintiffs contend that at the time the railcar was returned to Burlington Northern Railroad by Continental, Continental believed it had emptied the contents of the railcar. Plaintiffs contend that while Continental employees were aware that some material remained in the railroad tank car, it is a fact question as to their knowledge of the amount of material in the railcar when it was returned to Texas. Mr. Gilbert stated in an affidavit that, when he spoke with a representative of Continental after Continental completed the unloading, he was told that the railroad tank car contained a "heel." Def. Ex. 14. As stated above, Continental's quotation to Mr. Gilbert stated that a "heel" refers to solids remaining in a railroad tank car following offloading. Mr. Gilbert further stated in his affidavit:

> It is my experience that [it] is normal to expect that containers have a small residual amount of product, known as a "heel," that must be cleaned before a container can be put back into service. In the waste and chemical industries, this means an amount of material left in a container that is so small that the container qualifies as empty and doe not require special treatment or a manifest that identifies it as a hazardous waste for transport. ... . I did not know, and was not told by anyone at BASF or CCC/MFR, that the railcar contained anything more than a heel when it left Missouri.

Def. Ex. 14, Gilbert Aff, ¶ 5.

Continental had no possession or control over the railroad tank car or its contents between July 22 and September 13, 2002. Railroad tank car DBCX 9804 arrived at the BASF Freeport facility on July 22, 2002. The NTSB Report states that, when the railroad tank car arrived at BASF's Freeport facility, "facility personnel conducted a routine inspection of the tank car and found no security seals on the dome housings or anywhere else on the tank car. Aside from the missing seals, they found no indications of tampering with the tank car or its contents." Def. Ex. 1 at 5. Sometime after the railroad tank car returned to BASF's Freeport facility, BASF determined that material remained in the railroad tank car and it arranged for contractor Mundy to remove the material. Employees of BASF and Mundy looked into the railroad tank car and observed that it was still about one-third full of material. According to the NTSB Report the employees "looked into the tank car through a 6-inch access opening and found that the tank car was about one-third full of material." Def. Ex. 1 at 5.

After receiving the railroad tank car on July 22, 2002, BASF never attempted to return the it to Continental to remove the material. BASF supervised Mundy employees in the unloading and handling of the railroad tank car. On September 11, 2002, Mundy employees heated the railroad tank car at the instruction of BASF employees. Temperature gauges, pressure gauges, and an automatic shut down mechanisms were all available for monitoring the material in the railroad tank car and

shutting it down if necessary. Neither BASF nor Mundy ever placed any pressure or temperature gauges in the railroad tank car to monitor the interior conditions from September 11, 2002, to the time of the explosion.

Heating of the railroad tank car was discontinued in the afternoon of September 11, 2002. Heating was resumed at 7:00 a.m. on September 12, 2002, and the heating continued, uninterrupted, for seventeen hours, until 7:00 a.m. the following morning. Neither BASF nor Mundy ever monitored the temperature of the material or the pressure within the railroad tank car during the seventeen hours of continuous heating. On September 13, 2002, at about 7:00 a.m., the primary unloader stopped heating the railroad tank car and began to transfer the product from the railroad tank car to a highway tank truck. Several minutes later the highway tank truck was full and the primary unloader closed the three inch valve on the railroad tank car. At approximately 7:45 a.m. the primary unloader and secondary unloader, who had been present during the unloading, left the area. At approximately 8:40 a.m. the railcar's pressure relief valve began to open and reset itself. At approximately 9:00 a.m. the railroad tank car's pressure relief valve began to continuously vent. At 9:05 a.m., BASF personnel began to apply water to the railroad tank car. At about 9:30 a.m., while water was being applied, the railroad tank car catastrophically ruptured. The damages which Plaintiffs seek were caused by the explosion.

The NTSB investigated the accident and issued a report on December 1, 2004. The NTSB Report stated that the probable cause of the accident was BASF's over pressurization of the railcar initiated by BASF's excessive heating of the material. The NTSB Report further stated that, contributing to the accident, was BASF's failure to monitor the temperature and pressure inside the railroad tank car during the heating of the material. Additionally the NTSB Report stated:

It should be noted that although MFR used appropriate safety procedures when heating DBCX 9804, MFR's lack of procedures for ensuring that the tank car had been emptied of all waste material after the unloading process in Hannibal was terminated allowed the tank car to be sent back to BASF containing about 8,000 to 10,000 gallons of waste. Had MFR taken steps to ensure that the tank car was truly empty before sending it back to BASF (such as by visually inspecting the interior of the tank through the 6-inch access opening), MFR would have learned that the tank car still contained waste and sent DBCX 9804 back to Freeport empty, in which case the Freeport facility would not have had to deal with the disposal of the material.

Def. Ex. 1 at 20.

Plaintiffs have admitted that, at the very least, BASF's actions were a contributing factor to the incident which resulted in this lawsuit.

In Count I of the First Amended Complaint, Plaintiffs allege negligence and/or gross negligence; in Count II, Plaintiffs allege negligence per se; in Count III, Plaintiffs allege strict liability; in Count IV, Plaintiffs allege breach of express and/or implied contract; and in Count V, Plaintiffs allege breach of third-party contract. This court has previously held that Plaintiffs failed to state a cause of law in Count I for gross negligence under Missouri law and failed to state a cause of action in Count III for strict liability under Texas law. As such, the court held that in the event the court determines that Missouri law is applicable to Plaintiffs' claim of gross negligence in Count I, the court will dismiss that claim, and, in the event the court determines that Texas law is applicable to Plaintiffs' claim of strict liability in Count III, that claim will be dismissed. Doc. 29.

First, in the pending Motion for Summary Judgment Defendant contends that Texas law is applicable to Plaintiffs' tort claims. Plaintiffs contend that Missouri law is applicable. Defendant further contends that summary judgment should be granted in its favor on Plaintiffs' tort claims because, as a matter of law, the actions and omissions of Plaintiffs' insured, BASF, and/or those under its control, are intervening and superseding events that constitute the sole proximate causes of

Plaintiffs' alleged damages; and because Plaintiffs have failed to proffer evidence to support their theories of liability. In regard to Plaintiffs' breach of contract claim, Defendant contends that summary judgment should be granted in its favor because Plaintiffs have failed to submit evidence of any written contract between Continental and BASF.

In Response, Plaintiffs argue, among other things, that Missouri law is applicable to their tort claims; that under Missouri law Continental had a duty to BASF upon returning the railroad tank car to Freeport to assure that it had done its job and empty the railcar; that Continental failed to do so; that Continental knew or should have known that there was a chance that injury would result from its conduct; and that as a proximate cause of Continental's conduct, Plaintiffs' insured, BASF, suffered damages. Plaintiffs further contend that there are genuine issues of material fact, under both Missouri and Texas law in regard to the relevant issues.

## STANDARD FOR SUMMARY JUDGMENT

The court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. See also Fenny v. Dakota, Minn.& E.R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003) (holding that an issue is genuine "if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party").

A moving party always bears the burden of informing the court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

In passing on a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in its favor. Id. at 255; Raschick v. Prudent Supply, Inc., 830 F.2d 1497, 1499 (8th Cir. 1987). The court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. However, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." Id. at 252. With these principles in mind, the court turns to an analysis of Defendant's Motion for Summary Judgment.

## DISCUSSION

**A.     Choice of Law:**

As stated above, this court has held that, in the event Texas law is applicable, Plaintiffs' claim based on strict liability should be dismissed and, in the event Missouri law is applicable, that Plaintiffs' claim based on gross negligence should be dismissed. Defendant contends that Texas law is applicable to Plaintiffs' tort claims and Plaintiffs contend that Missouri law is applicable. In regard to apportioning fault in a matter involving negligence, Missouri allows a negligent plaintiff to recover proportionate damages even though his fault may have been greater than that of the party from whom

he seeks damages. See Hicks v. Graves Truck Lines, Inc., 707 S.W.2d 439, 442 (Mo. Ct. App. 1986). Thus, Missouri applies a pure comparative fault standard. See Gustafson v. Benda, 661 S.W.2d 11 (Mo. 1983).

On the other hand, Texas law prohibits recovery by a plaintiff who bears fifty percent or more of the responsibility for its damages. See Tex. Civ. Prac. & Rem. Code § 33.001 ("In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."). Where, however, the percentage of responsibility attributed to the defendant is greater than fifty percent, Texas law provides that a defendant is liable to a claimant for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility. See Tex. Civ. Prac. & Rem. Code § 33.013(a).[3] Because BASF has admitted that, at the very least, its actions were a contributing factor to the incident which resulted in this lawsuit, it is significant whether Missouri or Texas law is applicable to Plaintiffs' tort claims.

When the jurisdiction of a federal court is based on diversity of citizenship, as it is in the matter under consideration, the federal court must apply the choice of law rule of the state in which it sits to determine which state's substantive law applies. See Wolfley v. Solectron USA, Inc., 541 F.3d 819, 823 (8th Cir. 2008); Heating & Air Specialists, Inc., v. Jones, 180 F.3d 923, 928 (8th Cir. 1999); Whirlpool Corp. v. Ritter, 929 F.2d 1318, 1322 (8th Cir. 1991); Birnstill v. Home Sav. of America, 907 F.2d 795, 797 (8th Cir. 1990). As this court sits in Missouri, it must look to Missouri's

---

[3]     Tex. Civ. Prac. & Rem. Code § 33.131(a) provides:

Except as provided in Subsection (b), a liable defendant is liable to a claimant only for the percentage of the damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

choice of law rule applicable to contracts and torts.[4]  In regard to contracts and torts, Missouri

follows the most significant relationship test to determine what state's law should apply. See Dillard

v. Shaughnessy, Fickel & Scott Architects, Inc., 943 S.W.2d 711, 715 (Mo. App. 1997); Birnstill,

907 F.2d at 797.  As stated in this court's prior Memorandum Opinion, Missouri and Texas law

applicable to Plaintiffs' contract claims are indistinguishable. Doc. 19 at 16.  As such, the court need

not determine whether Missouri or Texas law is applicable to Plaintiffs' contract claims.[5]

Where choice of law is at issue in a tort claim, the Eighth Circuit has explained that Missouri

law provides as follows:

> To resolve a tort claim, the court must evaluate the following contacts listed in § 145
> of the Restatement: (a) the place where the injury occurred; (b) the place where the
> conduct causing the injury occurred; (c) the domicile, residence, nationality, place of
> incorporation, and place of business of the parties; and (d) the place where the
> relationship, if any, between the parties is centered. Where the place of conduct and
> the place of injury occur in two different states, Missouri choice of law rules dictate
> that the place where the act takes harmful effect or produces the result complained
> of is the more significant contact. Galvin v. McGilley Memorial Chapels, 746 S.W.2d
> 588, 590-91 (Mo. Ct. App. 1987); Carver v. Schafer, 647 S.W.2d 570, 578 (Mo. Ct.

---

[4]      Defendant contends that Texas choice of law rule is applicable because Plaintiffs
admitted in related litigation arising from the same events, which litigation took place in Texas, that
Texas law applies to their claims. Doc. 88-2 at 5.  Nonetheless, this federal court sitting in Missouri
is bound by federal law discussed above and must apply that law to determine whether Texas or
Missouri law is applicable to Plaintiffs claims against Continental.

[5]      The court notes that, in contract actions, the factors to be considered when
determining the most significant contacts include the place of contracting, the place of negotiation
of the contract, the place of performance, the location of the subject matter, place of business of the
parties, and the place where the relationship of the parties is centered. See Birnstill v. Home Sav. of
America, 907 F.2d 795, 797 (8th Cir. 1990). In the matter under consideration, the facts do not
suggest that representatives of Defendant or of BASF traveled outside of their home states to
communicate with one another regarding the terms for Defendant's removal of the material from the
railroad tank car.  It is undisputed, however, that when the material arrived in Missouri Defendant
was to perform its obligations in Missouri.  To the extent Defendant failed to perform its obligations
and to the extent Defendant engaged in conduct which caused or contributed to Plaintiffs' damages,
Defendant engaged in such conduct in Missouri.

App. 1983).

Birnstill, 907 F.2d at 797.

In the matter under consideration, Plaintiffs' insured, BASF, suffered its losses in Freeport, Texas; Defendant's conduct which allegedly caused the damages took place in Missouri; neither Texas or Missouri is more significant in regard to the place where the parties' relationship is centered; only Defendant has its place of business in Missouri; and the location of Defendant's conduct which caused Plaintiffs' damages and the place where the damages were incurred are in two different states.

Plaintiffs argue that upon determining whether Texas law should apply the court should take the most significant contact analysis a "step further" and "evaluate [the contacts] according to their relative importance with respect to the particular issues." Doc. 95 at 8 (citing Hicks v. Graves Truck Lines, Inc., 707 S.W.2d 439 (Mo. Ct. App. 1986). In Hicks, the Missouri court refused to apply Kansas law applicable to apportionment of fault and *applied Missouri's comparative fault doctrine, despite the fact that the accident which caused the plaintiff's damages occurred in Kansas.* Upon reaching this decision, the Missouri appellate court considered the interests of Missouri and Kansas and held:

> The legitimate state interest of Missouri in application of Missouri comparative fault rules arises from a policy of compensating Missouri residents in the courts of [Missouri] in the manner which this state's laws have declared. The policy is particularly applicable where, as here, the Kansas accident location was fortuitous and unrelated to any other relationship of the parties. The Kansas state interest, however, must also be recognized. That interest is the entitlement of Kansas to shield its residents from the effects of torts committed in the state if the claimant is found to have been the more at fault. ... .

> ... A real choice of law problem is presented when the contacts of both states

with the event are sufficient under the Federal Constitution to permit each state's law to be applied. Leflar, American Conflicts Law, § 93, (3rd Ed.1977). This [ ] issue in the present case not controlled by ... [any] reported Missouri case.

> ...

> A number of states have adopted a conflict resolution rule referred to variously as the governmental interest analysis, <u>Williams v. Williams</u>, 390 A.2d 4, 5 (D.C.App.1978), the flexible governmental interest approach, <u>Baron & Co. Inc. v. Bank of New Jersey</u>, 504 F.Supp. 1199, 1204 (D.N.J.1981), the comparative impairment of state policies, <u>S.A. Empresa v. Boeing Co.</u>, 641 F.2d 746 (9th Cir.1981), or advancement of the forum's governmental interest. <u>Hime v. State Farm Fire & Casualty Co.</u>, 284 N.W.2d 829, 833 (Minn.1979) ... . The concept was further refined to the comparative impairment approach. As described in <u>Offshore Rental Company, Inc. v. Continental Oil Company</u>, 583 P.2d 721, 726 (Cal. banc 1978), the comparative impairment approach seeks to determine which state's interest, assuming a "true" conflict, would be more impaired if its policy were subordinated to the policy of the other state. This analysis proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied.

> Unconstrained by prior Missouri authority, we conclude the government interest analysis offers the better method for resolving true conflict of laws cases, that is, cases in which the Restatement, § 145 test discloses significant contacts with two or more states, each of which has a legitimate local interest in the particular issue in contest. The applicability of the doctrine to the subject case is illustrated by comparison with the facts and decision in <u>Lettieri v. Equitable Life Assurance Society of the United States</u>, 627 F.2d 930 (9th Cir.1980).

<u>Hicks</u>, 707 S.W.2d at 442-44.[6]

Applying the governmental interest analysis, the Missouri appellate court concluded in <u>Hicks</u>,

707 S.W.2d at 444, that significant interests of Missouri would be impaired if the Kansas modified

---

[6]     In <u>Wise v. Pottorff</u>, 987 S.W.2d 407, (Mo. Ct. App. 1999), the Missouri appellate court distinguished <u>Hicks</u>, 707 S.W.2d at 444-45, and applied Kansas comparative fault, which barred recovery if the plaintiff was more than fifty percent at fault. Upon so doing, the Missouri appellate court considered that in <u>Wise</u>, the only Missouri contact was that one defendant resided in Missouri, while in <u>Hicks</u> there were other significant contacts with Missouri. Likewise, in the matter under consideration, there are contacts with Missouri other than just Defendant's residing in this State; the conduct which is the basis of Plaintiffs' negligence claims against Defendant took place in Missouri.

comparative fault doctrine was applied. The court further considered that Kansas interests were "not greatly impaired if Missouri comparative fault law" was applied. Upon reaching this conclusion the court considered that, upon paying damages based on Missouri comparative fault, the Kansas defendant would "still receive[] some protection in that the amount [would be] reduced in direct proportion to the contributing fault." Id. at 445.

As set forth above, in the matter under consideration, there are significant contacts with both Texas and Missouri. Under such circumstance, this court is required to apply the governmental interest analysis adopted by the Missouri appellate court in Hicks, 707 S.W.2d at 444-45. As in Hicks, if Missouri's comparative fault is applied in the matter under consideration, Defendant will be protected in that it will be required to compensate Plaintiffs only for damages incurred in direct proportion to Defendant's contributing fault. Moreover, as stated in this court's prior Memorandum Opinion, Texas substantive law applicable to determining whether Defendant was negligent is the same as Missouri law. As such, the court finds that Missouri's comparative fault is applicable to the apportionment of damages recoverable by Plaintiffs pursuant to their tort claims in Counts I and III. See id. To the extent Plaintiffs claim gross negligence in Count I of the Amended Complaint, that aspect of Count I will be dismissed as this court has previously held that no such cause of action exists under Missouri law.

**B.     Plaintiffs' Negligence Claims:**

In its previously issued Memorandum Opinion in this case the court set forth the requirements of a cause of action for negligence, as alleged in Count I of Plaintiffs' Amended Complaint. As stated by the court:

The parties do not dispute that a negligence claim includes the following elements

under both Texas and Missouri law: (1) the defendant had a duty; (2) the defendant breached that duty; (3) the breach was the proximate cause of the plaintiff's damages; and (4) the plaintiff actually incurred damages as a result. <u>Bray v. Brooks</u>, 41 S.W.3d 7, 15 (Mo. Ct. App. 2001). In the First Amended Complaint, as set forth above, Plaintiffs allege the factual basis for their claims against Defendant, including that BASF contracted with CWM for the disposal of the chemical substance; that CWM arranged for the chemical substance to be delivered to Defendant by rail car; that Defendant was to empty the entire rail car; that Defendant failed to do so; and that, therefore, the rail car was returned to Texas where Mundy was engaged to complete the removal of the chemical substance. Additionally, in Count I, Negligence, Plaintiffs allege that ... Defendant had a duty to Plaintiffs to, among other things, obey the applicable standards of care and fulfill the representations it made to BASF in conjunction with the disposal of the chemical substance. Plaintiffs further allege, with specificity, the manner in which Defendant allegedly breached that duty including failing to insure proper and complete removal of the chemical substance and failing to recognize that some of the chemical substance remained in the tank. Further, Plaintiffs allege that as a result of Defendant's breach of its duty BASF suffered damages.

Doc. 29 at 11.

In regard to Count I, the court finds that there are genuine issues of material fact, including, but not limited to, the scope of Defendant's duty; whether Defendant had a duty to remove a specific amount of the material from the railroad tank car; whether Defendant's employees had a reasonable belief that the car was empty; whether Defendant informed BASF that the railroad tank car was empty; and whether conduct on the part of Defendant was a cause of the September 13, 2002 explosion at BASF's Freeport, Texas, facility. There further remains a genuine issue of material fact in regard to the amount of material remaining in the railroad tank car when it was returned to Freeport, Texas. As such, the court finds that Defendant's Motion for Summary Judgment should be denied as to Plaintiffs' negligence claim in Count I.

In Count III, Plaintiffs allege strict liability. As previously held by this court:

Under Missouri law, to state a claim for strict liability a plaintiff must allege that: (1) the defendant's activity created a high degree or risk or harm; (2) the harm has been

and will be significant; (3) the risk cannot be eliminated; and (4) the harm outweighs the value of the activity. <u>Rychnovsky v. Cole,</u> 119 S.W.3d 204, 211 (Mo. Ct. App. 2003).

Doc. 29 at 14.

In regard to strict liability under Missouri law, the court finds that there are genuine issues of material fact, including, but not limited to, whether Defendant followed the applicable standard of care in removing the material from the railroad tank car; whether Defendant acted negligently or unreasonably in the removal and handling of the material from the railroad tank car; whether Defendant's conduct created a high risk of harm; and whether Defendant undertook steps to minimize the risk of harm. As such, the court finds that Defendant's Motion for Summary Judgment should be denied in regard to Count III.

To the extent that Defendant contends that summary judgment should be granted in its favor in regard to Counts I and III because the undisputed facts establish that Mundy's and/or BASF's conduct upon emptying the railroad tank car upon its return to Freeport was a superceding intervening cause, this court has previously held:

> While the "general test for proximate cause is whether an injury is the natural and probable consequence of the defendant's negligence," "[e]ach case is decided on its own facts." <u>Daniels v. Senior Care, Inc.</u>, 21 S.W.3d 133, 138 (Mo. Ct. App. 2000). <u>See also</u> <u>Connaway v. Village Farms, L.P.</u>, 200 S.W.3d 353 (Tex. Ct. App. 2006). Under Missouri law, in order for a question of whether a defendant was negligent to go to the jury, a plaintiff need only present "slight evidence." <u>Daniels</u>, 21 S.W.3d at 139 (citing <u>Keeney v. Callow</u>, 349 S.W.2d 75, 80 (Mo.1961)). <u>See also</u> <u>Stroot v. Taco Bell Corp.</u>, 972 S.W.2d 447, 449 (Mo. Ct. App. 1998) (holding that whether proximate cause exists is generally a question of fact for the jury). Under Texas law, even where damage is immediately inflicted by another, the negligence of the original tort-feasor may be the proximate cause of a plaintiff's damage so as to impose liability upon the defendant. <u>Hold v. Ray</u>, 435 S.W.2d 568, 771 (Tex. Ct. App. 1968). Moreover, "[w]here injury or damage has resulted from a wrongful act which is the original cause of an event, in that, such event is a part of a chain of events set in motion by a party, such party may be held responsible for the total result." <u>Id.</u>

(citation omitted). Thus, in the matter under consideration, given the facts alleged in the First Amended Complaint, whether or not Mundy's conduct was a superceding intervening cause of BASF's damages is a question of fact for the jury ... .

To the extent that Defendant contends that Mundy's conduct was the sole proximate cause of BASF's damages because it was a superseding, intervening cause, according to both Missouri and Texas law, an intervening cause must be of a wholly "independent," "distinct," "successive," unrelated' ... character." Jordan, 675 S.W.2d at 903. See also Bell v. Campbell, 434 S.W.2d 117, 20 (Tex. 1968).

Doc. 29 at 15.

The court finds that there are genuine issues of material fact in regard to Defendant's claim that Mundy's and/or BASF's conduct was a superceding intervening cause including, but not limited to, whether Defendant properly removed the material from the railroad tank car; whether, if Defendant had properly removed the material, it would have been necessary for BASF to employ the services of Mundy to empty the railroad tank car; whether Defendant's conduct was a proximate cause of the explosion at BASF's facility in Freeport on September 13, 2002; whether the explosion was forseeable in the event Defendant did not remove the material as agreed by the parties; whether the explosion was forseeable in the event Defendant did not accurately inform BASF of the amount of material remaining in the railroad tank car; and whether BASF and/or Defendant knew of the dangerous nature of the material. As such, the court finds that Defendant's Motion for Summary Judgment should be denied in regard to Defendant's claim that Mundy's and/or BASF's conduct was a superceding intervening cause.

## C.    Breach of Contract Claims:

In regard to Plaintiffs' allegations of breach of express and/or implied contract in Count IV of the Amended Complaint, Defendant contends that BASF had no written or oral contract with Defendant. This court has previously held that "[u]nder both Missouri and Texas law the essential

terms of a contract include offer, acceptance of the terms of the offer, a meeting of the minds, and execution and delivery of the contract with the intent of becoming bound." Doc. 29 at 16 (citing Tower Props. Co. v. Allen, 33 S.W.3d 684, 688 (Mo. Ct. App. 2000); Hallmark v. Hand, 885 S.W.2d 471, 476 (Tex. Ct. App. 1994).

It is undisputed that Chemical Waste Management was consulted by BASF to broker the disposal of the CHO material; that Chemical Waste Management chose Defendant to do so; and that Defendant made a written proposal setting forth proposed terms applicable to its removal of the material. Indeed, the facts suggest that some sort of agreement was reached as BASF shipped the material to Defendant and Defendant undertook its removal from the railroad tank car. There remain, however, genuine issues of material fact in regard to the terms of such an agreement. In particular, there remain genuine issues of material fact, including, but not limited to, whether Defendant's proposal represented the entire understanding between the parties; whether Defendant offered to remove a particular quantity of the material from the railroad tank car; what Defendant's obligations were in regard to a heel remaining in the railroad tank car; and, specifically, what the parties intended "a heel" to include. As such, the court finds that Defendant's Motion for Summary Judgment, in regard to Plaintiffs' claims of express and/or implied contract in Count IV, should be denied.

Defendant contends that summary judgment should be granted in its favor in regard to Count V of Plaintiffs' Amended Complaint, alleging that Defendant breached a third-party beneficiary contract. In Count V, Plaintiffs allege that enforceable and valid contracts existed between Chemical Waste Management and Defendant regarding the disposal of the chemical substance; that the contracts between Chemical Waste Management and Defendant demonstrate the parties' intent to

confer direct benefit to BASF; that BASF was intended to be a third-party beneficiary of the contracts between Chemical Waste Management and Defendant; and that, as a result of Defendant's breach of the contracts, BASF suffered damages. It is undisputed that Chemical Waste Management was consulted by BASF to broker the disposal of the material and that Chemical Waste Management chose Defendant to do so. As stated above, however, there remain genuine issues of material fact as to the terms of the agreement reached between Chemical Waste Management and Defendant. As such, the court finds that Defendant's Motion for Summary Judgment should be denied in regard to Count V.

## CONCLUSION

To the extent that Plaintiffs request that Count II be dismissed from the Amended Complaint, the court finds that the request should be granted. For the reasons discussed above, the court finds that Missouri law is applicable to Plaintiffs' tort claims; that Defendant's Motion for Summary Judgment should be denied, in regard to Count II, as moot; that there are genuine issues of material fact in regard to Counts I, III, IV, and V of Plaintiffs' Amended Complaint; and that, therefore, Defendant's Motion for Summary Judgment should be denied in regard to Counts I, III, IV, and V. The court further finds that Plaintiffs' claim for gross negligence in Count I should be dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' claim for gross negligence in Count I is **DISMISSED**;

**IT IS FURTHER ORDERED** that Count II is **DISMISSED,** in its entirety;

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, in regard

to Count II, is **DENIED**, as **MOOT**; Doc. 87

       **IT IS FURTHER ORDERED** that Defendant's request for a hearing is **DENIED**; Doc. 87

       **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment, in regard to Counts I, III, IV, and V is **DENIED**; Doc. 87


                                   /s/Mary Ann L. Medler
                                   MARY ANN L. MEDLER
                                   UNITED STATES MAGISTRATE JUDGE


Dated this <u>5th</u> day of October, 2009.